DICIE FOSTER, Respondent, v. THOMAS H. WEST, W. C. NIXON, and W. B. BIDDLE, Receivers of THE SAINT LOUIS & SAN FRANCISCO RAILROAD COMPANY, Appellants.

Springfield Court of Appeals, May 22, 1916.

1. **RAILROADS:. Injuries to Persons on Tracks; Duty of Engineer in Approaching Persons in Peril.** An engineer skilled in operating trains must be held to know approximately in what time his train can be stopped and in approaching a person on the track seen to be giving no heed and apparently oblivious to the train's approach, must take timely and effectual steps to prevent such person's injury when possible to do so.

2. ———: ———: ———: **Humanitarian Rule.** Though a person is a trespasser on a railroad track and negligent in giving no heed to an approaching train, yet, under the humanitarian rule, when he is seen by the engineer on the track in time to avoid injuring him by stopping the train and his actions reasonably indicate that from deafness or other cause he is not aware of the approaching danger, then it becomes the duty of the engineer on seeing that the warning signals are ineffectual to slow up and stop his train in time to avoid striking him, and a failure so to do constitutes liability regardless of the negligence of the deceased.

3. ———: ———: ———: ———: **Jury Question.** The duty of an engineer to begin stopping his train when a person is seen by him on the track apparently oblivious of his peril arises under the humanitarian rule not only when the engineer actually realizes that such person cannot or will not escape from the peril, but when as a reasonably prudent engineer he ought from the visible facts to realize the peril and take steps to avoid the injury. Under the facts of this case such question is for the jury.

4. ———: ———: **Instructions.** Action for death of trespasser on defendants' railroad track. Under Sec. 5425, R. S. 1909, an instruction *held* proper which directed the jury to award an amount not less than $2000, nor more than $10,000, in the discretion of the jury, taking into consideration on the one hand, the evidence· showing the pecuniary loss such as the age, earning capacity, etc., of the deceased and on the other hand the facts and circumstances attending the killing and showing the degree of negligence of defendants.

5. ———: ———: **Instructions.** Action for death of trespasser on defendants' railroad track, under Sec. 5425, R. S. 1909. An

instruction which limited the recovery to $2000 was properly re-
fused where there was evidence sufficient to warrant compensatory
damages in that deceased was an able bodied farmer with no dis-
ability other than a defect in hearing.

Appeal from Pemiscot County Circuit Court.—*Hon.
Frank Kelley,* Judge.

AFFIRMED.

*W. F. Evans, Moses Whybark* and *A. P. Stewart*
for appellants.

*Ward & Collins* for respondent.

STURGIS, J.—The plaintiff recovered a judgment
for $3000 for the death of her husband who, while a
trespasser on defendant's railroad track, was run down
and killed by defendant's train. The receivers of the
"Frisco Railroad" then operating such road are the
defendants, but for convenience we will speak of the
railroad company as defendant. The plaintiff concedes
that the deceased was negligent, both in using defend-
ant's track as a footpath for travel and in not giving
proper attention to trains approaching from his rear.
The cause of action is based solely on the humanitarian
doctrine in that defendant's servants operating this
train saw the deceased in abundant time to have avoided
his injury and negligently failed to do so after they
realized, or as reasonably careful and skillful employees,
should have realized deceased's peril. This is practi-
cally the only point in the case, as defendant insists that
a verdict should have been directed for it, and the ob-
jection to plaintiff's instruction, submitting the case
to the jury on this theory, goes to the question of there
being no evidence sufficient to sustain the instruction.

In determining the issues the physical facts become
important, though such facts are practically undisputed.
The train causing this injury was a light one, consist-
ing only of engine and caboose, equipped with air
brakes and was a special not running on a regular
schedule time. It was traveling north approaching the

station of Micola, in Pemiscot County, some mile or more from the place of the accident. The deceased was also traveling north toward this same station, walking in the middle of the track. The train came around a curve about a half mile south of the place of the accident and from this on north the track was straight, unobstructed and almost level. The deceased was in plain view from the time the train rounded the curve and both the engineer and the fireman saw and observed him from that point until the train struck him. It was a clear dry day and the train was under perfect control. There was a road crossing near the end of the curve and another about a quarter mile further north. The usual whistle signals were given for both these crossings, to which the deceased gave no apparent heed. The train, when at this second crossing, was following the deceased, and near a quarter mile from him. On passing the second crossing and the deceased showing no indication that he was aware of the approaching train, the engineer began sounding the alarm signals and continued to do so until the engine was within two or three hundred feet of deceased. When the deceased still continued walking down the track with no indication, so far, that he was aware of the approaching danger or was intending to leave the track, the engineer shut the throttle and put on the emergency brakes. The train was not stopped in time to avoid striking the deceased, and the engine came to a stop some eighty-five to a hundred and twenty feet beyond. The deceased's conduct is explained by the fact that he was hard of hearing, though of course the trainmen did not previously know this fact.

The engineer testified that he was in charge of the train, consisting of an engine and caboose, running north from Turrell, Ark., to Chaffee, Mo. That after coming around the curve south of Micola, he saw a man walking north in the center of the track. That he was on the right hand side of his engine and the fireman was on the left hand side, and the conductor and two brakemen were in the caboose. That after coming around the curve, he whistled two or three road-crossing

whistles, which consist of two long blasts and two short blasts of the whistle. That the man just kept walking, up the track. That after sounding the road-crossing whistle, he blew the stock alarm, which is a succession of short blasts of the whistle, and he continued to do so until he got within 200 or 300 feet of the man, who had not yet looked around or changed his gait or direction but was walking in the middle of the track, and saw he wasn't going to get off, and he then closed the throttle and shut off the steam from the cylinders and applied the brakes in emergency. That the air brakes were all right and in good working order. That after shutting off the steam and applying the air in emergency, he did not sound any danger signal. That at the time he shut off the steam and applied the air in emergency, his train was running about thirty miles an hour, and it had checked down to about fifteen miles an hour at the time the man was struck. That just before he was struck, he seemed to be kind of walking off to the side of the track, had his foot off the rail out on the ties, had already stepped over the rail and was in the act of stepping off the track, when the pilot beam struck him. That the engine, tender and caboose were about eighty or ninety feet in length. That when the train stopped, the rear end of the caboose was from fifteen to thirty feet past where the man was lying on the ground. That at the time he had been a locomotive engineer for about four years, and prior to that had about five years experience on trains. That after realizing that the man did not hear the train running or the danger signal, he could not have stopped his train any quicker than he did because he gave the emergency at that time, shut off the steam and applied the emergency. That when he applied the air in emergency the train was going about thirty miles an hour. That it takes a couple of seconds to shut off the engine and three to five seconds after the air is applied until the brakes take effect on the wheels, and that during this time the train is still moving at thirty miles an hour. That after applying the air in emergency and shutting

off the engine there is nothing else he could do toward stopping the train, unless he reversed the engine, but at that rate of speed you might tear the engine all to pieces and slide the wheels and you couldn't stop as quick as. if you didn't reverse it. That to reverse an engine at a speed of thirty miles an hour would tear the running gear up or slide the wheels. That he did not know deceased and had never seen him before this day, and did not know anything about his being deaf; that he did not know there was anything wrong with him until he saw he wasn't going to get off the track.

The fireman testified that he first saw Foster on the track just after the train came around the curve south of Micola; that they were a little more than a quarter of a mile from him at that time. That as they came around the curve the engineer blew the crossing whistle, and after they got around the curve he began blowing the stock alarm. That the engine was about 250 to 300 feet from the man when the engineer shut the throttle and applied the brakes in emergency; that *at that time the man was between the two rails,* and when they got a bit closer it seemed like the man turned and looked over his left shoulder, but he didn't get all the way off. He looked as though he saw the train, and then started diagonally off toward the right hand side. That he did not see him hit, because the front end of the boiler blocked his view. That when the engine stopped, the front end of the engine was about eighty-five feet past the man, and the rear end of the caboose about thirty feet past where he was lying.

There was evidence on behalf of plaintiff that this train could have been stopped with safety in 100 to 150 feet. But this seems rather incredible and plaintiff at the argument stated that this evidence is not relied on for an affirmance. This difference, however, may largely arise from not taking into account the time lost and distance covered in putting on the brakes and their taking effect on the wheels. The fact that the trainmen say the speed was reduced from thirty to fifteen miles per hour in passing over the 200 to 300 feet before striking the deceased and was then brought to a stop

in eighty-five to a hundred feet more, supports this theory. But however, this may be the engineer, skilled in handling trains and engines, must be held to have known approximately in what distance this train could be stopped under the existing conditions and, if it be true that this train could not be stopped within the distance it was from deceased when he first tried to stop it, he knew that fact and should have taken it into consideration when his engine was gradually approaching the deceased. According to his own evidence, it took at least five seconds to put on the brakes and have them take effect, and in that time the train running thirty miles per hour would pass over at least 200 of the 250 to 300 feet between the engine and deceased. Should not a skillful and prudent engineer have taken this fact into consideration in determining when to put on his brakes? It is well said in Dutcher v. Railroad, 241 Mo. 137, 165, 145 S. W. 63; "Care to be *due* requires that alarm signals be given when they would be effective. And due care required that the attempt to stop should be made, as a last resort, when it would be effective; for if defendant owed any duty to stop at all that duty must begin when it amounts to something worth while. It must not be pretermitted until it amounts to nothing whatever."

The defendant insists that no liability is shown for the reason that, stated in various language, there is no proof of actionable negligence on the part of the engineer *after he realized* that the deceased did not hear the oncoming train; that *after becoming aware* of the imminent peril of the deceased, the engineer did all in his power to stop the train; that the duty to exercise ordinary care did not devolve upon the engineer until he *became aware* of deceased's peril and if he did all he could after that time there is no negligence; that where the engineer did all he could to avert the injury after he *saw* the perilous situation of deceased, the humanitarian doctrine does not apply; that plaintiff's instruction is wrong which predicates liability on the fact, if found, that the engineer did not use care in stopping the train, after the engineer saw and realized

deceased's peril and that deceased did not know of his danger.

The argument is the engineer, not knowing of any infirmity of the deceased, had a right to rely on the fact that he would observe the train and leave the track on its approach; that the engineer testified that he did not know or realize that deceased was not going to leave the track and therefore was in danger until the engine was within 200 to 300 feet and too close for him to stop his train; that this fact is not, and cannot well be, contradicted, for in the nature of things the engineer is the only one who knows at what point he becomes aware of or realizes that a man on the track is in peril. Is it true that the jury is bound to accept the engineer's statement as true as to when he realized the deceased's peril? Is not an engineer, as other persons, to be held to know facts, inclusive of when he realized the danger to deceased, which a prudent man, under the circumstances, should know? When the facts, including the engineer's statement, are not conclusive either way, is it not a question for the jury to say when a reasonably prudent engineer should know, and therefore find that he did know, that the deceased was, at a particular time, in peril? Any other rule would permit an engineer in all cases, at least where he did not have personal knowledge of the person's infirmity in seeing or hearing, to rely on the person on the track getting off and out of danger till his engine was too close to stop it and then there would be no use to stop it. The defendant goes so far, and so his logic leads him, as to say that the engineer did not owe the deceased the duty to even give the warning signals. The trouble is that defendant's premises are wrong, and the conclusion reached is not the law. In Lynch v. Railroad, 208 Mo. 1, 34, 106 S. W. 68, it is said: "But even if he had been guilty of contributory negligence, running as he was for a half mile or two-thirds of a mile in plain view of the engineer and fireman on this engine and having indicated in no way to them his knowledge of their approach, it was their plain and obvious duty to exercise reasonable care for his safety and not run

over him. From the time they saw him and observed, as alleged in the defendant's answer, that he was not looking back and was ignorant of their approach, it was their duty to warn him and to slow down the train and stop if necessary in order to save his life."

In Chamberlain v. Railroad, 133 Mo. 587, 605, 33 S. W. 437, the court, speaking of an instruction defining the engineer's duty when seeing a trespasser on the track ahead of his engine, uses this language: "But the instruction would not be proper in all cases, as the signal if given in time would be all that was required to apprise a trespasser, until it is seen he *apparently does not hear it.* The engineer is not required to stop his train if the trespasser is far enough away to warn him, and a timely warning is sufficient until it is seen that for some cause it is not heeded; then it is his duty to avoid killing, even a trespasser, if by the exercise of ordinary care it can be done."

The Dutcher case, supra, quotes with express approval from 2 Shear. & Red. on Negligence, secs. 483, 484, the following: "Thus, a locomotive engineer or motorman, after becoming aware of the presence of any person on, or dangerously near the track, however imprudently or wrongfully, is bound to use as much care to avoid injury to him as he ought to use in favor of one lawfully and properly upon the track, that is to say, ordinary care with respect to *anticipating injury* before it becomes imminent, and the utmost care and diligence of which he is personally capable, after he knows that it is imminent. He must promptly use all the usual signals to warn the trespasser of danger, and he must also check the speed of his train, and even bring it to a full stop, if necessary, unless the circumstances are such as to justify him, acting prudently, in believing that the traveler sees or hears the train and will step off the track in ample time to avoid all danger, without any diminution of the speed of the train. . . . In general, an engineer has the right to assume that a person walking upon the track is free to act, and is in possession of all ordinary faculties, and will therefore act with ordinary prudence; but

*when the conduct* of the traveler is such as to *excite a doubt* of this, the engineer is bound to use greater caution, and to check or even stop the train, as may be necessary.'' See, also, Degonia v. Railroad, 224 Mo. 564, 595, 123 S. W. 807. In Smith v. Railroad, 129 Mo. App. 413, 419, 107 S. W. 22, it is said: "It was further shown by the defendant's engineer himself that he saw plaintiff upon the track and while he stated that after he sounded the alarm he noticed that plaintiff stepped over the rail as though to get off, he further stated that the engine was then within fifty or sixty feet of him. Shortly further on in his testimony, he stated that he did not apply the emergency brake until 'about the time when I struck him.' It seems quite apparent that the evidence tends to show that defendant's servants after becoming aware of (or as ordinarily reasonable and prudent men they should have realized), plaintiff's peril, they did not use ordinary care to save him. It was not necessary to plaintiff's case that defendant's servants should have had absolute knowledge that plaintiff was in peril, for such state of information could scarcely exist in such situation. So therefore defendant will not be permitted to indulge in unreasonable suppositions as to the probability of plaintiff moving out of danger although apparently oblivious to it, with the engine nearly upon him. An engineer ordinarily has the right to assume that one on the track will leave it at the approach of a train. But that assumption is based upon the person being aware of the train's approach, and if the situation is enough to suggest to a reasonably prudent man that he is not aware, then the assumption should not be indulged.''

In the same case, page 421, the court quotes with approval from Railway v. Munn (Texas), 102 S. W. 442, as follows: "To require proof that the engineer actually knew that the deceased would inevitably be killed unless the engine was stopped, and that he nevertheless continued his course, would be to require that a case of murder be established, and in our opinion it is not necessary that the proof should fasten upon the engineer any act or omission involving moral turpitude.

Nor, on the other hand, do we allow the proposition that he may speculate on the chances of one leaving the track until too late for the effective use of the means at hand after knowledge of the peril. To allow such a doctrine would abrogate the rule of liability in all cases, save where the situation of the person on the track rendered it manifestly impossible for him to do aught for himself. If it appears from the evidence that the engineer realizes that deceased was ignorant of the approach of the train, and therefore would not probably leave the track, the new duty thereby arose, and for the engineer's failure to discharge it the company is liable.''

In Sinclair v. Railway, 133 Mo. 233, 243, 34 S. W. 76, the case most favorable to defendant, the court said: ''In other words, the charge is that the engineer was negligent in not stopping the train in time to avoid striking deceased. This duty of the engineer arose as soon as he knew, or by proper care *ought to have known,* that deceased did not regard the warning signal.''

In Reyburn v. Railroad Co., 187 Mo. 565, 86 S. W. 174, the court held that though a pedestrian enters upon the fenced track of a railroad and uses it as a footpath and walks in it apparently heedless of the danger entailed, yet if the railroad's servants in charge of the locomotive see him and realize his danger, it then becomes their duty to exercise ordinary care to do what they can with the means at hand to avoid injuring him, and if they fail in that duty the railroad company is liable for his consequent injuries, notwithstanding his negligence. And as showing the defendant's liability, stated: '' . . . . the engineer and fireman saw the man, saw that he was walking with his back towards them never once looking around, manifesting by his every movement that he was unmindful of the approaching train, yet without so much as lifting their hands to touch the bell or whistle they ran on him and killed him.'' In Johnson v. Traction Co., 176 Mo. App. 174, 161 S. W. 1193, this court held, to quote from the syllabus, thus: ''Where there is an unobstructed view of a wagon either on a street railway track or so near thereto as to be in the danger zone, so that the jury is war-

ranted in finding that the motorman either saw, or by due care could have seen, such wagon in the place of danger in time to stop the car and avoid the collision, then the time and place where his duty in this regard arose is somewhere between the first place of vision and the collision and is determined by the phrase 'in time to avoid the collision.' "

In Quinley v. Traction Co., 180 Mo. App. 287, 304, 165 S. W. 346, this court approved an instruction that "if you find that plaintiff was approaching said track and that she was unconscious of the approach of said car and that it was apparent to a *reasonably prudent* person that she was unmindful of danger and was going upon said track, then it was the duty of the motorman to at once have taken precaution to avoid the collision." See also a review of cases on this point in the concurring opinion on page 308.

We think that there was ample evidence here to warrant a finding that a reasonably prudent engineer would have realized that deceased was not aware of the approach of this train, and therefore oblivious to his own danger, before the train was too close to be stopped. In such a case the engineer could not longer rely on the deceased going out of the danger of which he was not apparently aware. The engineer seems to have scented danger on passing the last crossing from the fact that deceased was giving no heed to and apparently had not heard the crossing signal. He then began sounding the shrill danger signals and ringing the bell. Notwithstanding this the deceased kept walking leisurely down the track with his back to the train, not turning his head to look or giving any heed, though the train was fast approaching giving these shrill danger alarms. The deceased's action was so unnatural and extraordinary for a normal human being as to have suggested that he was either demented or substantially deaf. The deceased's every action indicated that he was oblivious to the approaching danger. The alarms were such that they attracted the attention of every person within a radius of a mile. The engineer and fireman acknowledged that the deceased was apparently oblivious to

his danger and gave no indication of his knowledge of the approaching train. This state of facts commenced near a quarter of a mile from the point of the accident and continued till the train was too close to deceased to be stopped. To hold that the engineer could maintain the speed of the train till too close to avert striking deceased and be held not guilty of negligence as a matter of law under these facts is a proposition to which we do not assent.

We believe that the appellate courts are now all agreed that an instruction fixing the measure of damages under section 5425, Revised Statutes 1909, when more than $2000 is sued for, is proper which directs the jury to award an amount not less than $2000 nor more than $10,000 in the discretion of the jury, taking into consideration on the one hand the evidence showing pecuniary loss such as the age, earning capacity, etc., of the deceased, and on the other facts and circumstances attending the killing and showing the degree of negligence or culpability of the defendant; and so, in effect, was the jury instructed here. [Kiser v. Met. Ry. Co., 188 Mo. App. 169, 172, 175 S. W. 98, and cases cited. Also, Loomis v. Railroad, 188 Mo. App. 203, 205, 175 S. W. 143; Baldwin v. Harvey & Durham, 191 Mo. App. 233, 236, 177 S. W. 1087; Holmes v. Railroad, 176 S. W. 1041, 1042; Roberts v. Trunk, 179 Mo. App. 358, 361-2, 166 S. W. 841; Harding v. Railroad, 248 Mo. 663, 668, 154 S. W. 711.] The defendant assigns as error the refusal of the court to give an instruction limiting the amount of plaintiff's recovery to $2000. It cites the case of Lasater v. Railway Co., 177 Mo. App. 534, 160 S. W. 818, in support of this contention. It will be noted, however, that in the Lasater case a divided court held that defendant in a case like this was entitled to an instruction limiting the amount to be recovered *as a penalty* to $2000, but here the instruction seeks to limit the entire recovery to $2000. If the amount of recovery is limited in such cases to $2000 as a penalty and the balance, if any, must be compensatory, there was evidence in this case that deceased was an able-bodied man, other than the defect in his hear-

ing, was a farmer, and the evidence is sufficient to warrant an additional $1000 as compensation. The instruction, therefore was properly refused. [Baldwin v. Harvey & Durham, 191 Mo. App. 233, 237-9, 177 S. W. 1087.]

The judgment will be affirmed. *Robertson, P. J.*, and *Farrington, J.*, concur.